UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DANIEL DEMERS, and
EDITH MANDUJANO-DEMERS;

    *Plaintiffs,*

    *v.*

TOWN OF ENFIELD,
CHIEF CARL SFERRAZZA,
OFFICER KEVIN RAGION,
SERGEANT JAMES LAURINO,
OFFICER VANESSA MAGAGNOLI,
OFFICER JOHN DOE, and
OFFICER JANE DOE;

    *Defendants.*

Civil No. 3:16-cv-1354 (JBA)

August 10, 2018

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Daniel Demers and Edith Mandujano-Demers were arrested for loitering on middle school grounds in Enfield, Connecticut, after driving around school grounds, stopping to take photographs at the school, knocking on a door that was not the main entrance, and then leaving. Plaintiffs contend that they were arrested in violation of their Fourth Amendment right to be free from unreasonable seizures in violation of state statutory and common law. Defendants move [Doc. # 32] for summary judgment on all counts. For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment.

# I.    Background

Plaintiffs Daniel Demers and Edith Mandujano-Demers brought this action on August 10, 2016, alleging violations of their rights under the Fourth, Eighth, and Fourteenth Amendments[1] to the U.S. Constitution, and related violations of their rights under Connecticut law (including under the Connecticut Constitution, Connecticut common law, and state statutory rights). (Compl. [Doc. # 1].) Plaintiffs filed an Amended Complaint on January 3, 2017 with the following counts:

- Count One: Unreasonable Seizure in Violation of the Fourth Amendment, brought under 42 U.S.C. § 1983

- Count Two: Failure to Intervene, brought under 42 U.S.C. § 1983

- Count Three: False Arrest—Connecticut common law

- Count Four: Recklessness—Connecticut common law

- Count Five: Negligence—Connecticut common law

- Count Six: Negligent Infliction of Emotional Distress—Connecticut common law

- Count Seven: Monell claim against the Town of Enfield, brought under 42 U.S.C. § 1983

- Count Eight: Indemnification pursuant to Conn. Gen. Stat. § 7-465

- Count Nine: Indemnification pursuant to Conn. Gen. Stat. § 52-557n

---

[1] Plaintiffs clarified at oral argument that they do not claim violations of their rights under the Eighth or Fourteenth Amendments.

(Am. Compl. [Doc. # 14].) The Amended Complaint names as Defendants the Town of Enfield, Chief Carl Sferrazza, Officer Kevin Ragion, Sergeant James Laurino, Officer Vanessa Magagnoli, Office John Doe, and Officer Jane Doe.[2] (*Id.*)

On October 18, 2017, Defendants moved to bifurcate the action against the individual Defendants from the *Monell* claim against the Town of Enfield, requesting that discovery on the municipal liability claim be stayed until resolution of the claim against the individual Defendants. (Defs' Mot. Bifurcate [Doc. # 28].) On December 21, 2017, the Court granted Defendants' Motion to Bifurcate, absent any objection from Plaintiffs. ([Doc. # 29].)

Defendants moved for summary judgment on all claims on January 15, 2018. (Mot. Summ. J.) Four days before Plaintiffs' extended deadline to oppose the Motion for Summary Judgment, Plaintiffs moved [Doc. # 36] for leave to file a second amended complaint. Defendants objected [Doc. # 38], and the Court denied Plaintiffs leave to amend. ([Doc. # 41].)

*Factual Background and Summary Judgment Record*

On Wednesday, March 23, 2016, Plaintiffs, who were residents of Summerville, South Carolina, were visiting the town of Enfield, which is the hometown of Plaintiff Daniel Demers. (Defs.' L.R. Stmt ¶ 1 [Doc. # 32-2]; Pls.' L.R. Stmt ¶ 1 [Doc. # 37-1] (hereinafter collectively, "Parties' L.R. Stmts").) During this visit, Plaintiffs drove to JFK Middle School, which Plaintiff Daniel Demers had attended in his youth. (Parties' L.R. Stmts ¶ 2.) Plaintiffs did not make any contact with anyone at JFK Middle School prior to arriving and did not know anyone at the school.

---

[2] The Amended Complaint names all individual Defendants in both their individual and official capacities, but Plaintiffs do not seek injunctive or declaratory relief, only compensatory and punitive damages and attorneys' fees. (*See* Am. Compl. at 17.) At oral argument, Plaintiffs clarified that the Amended Complaint should be construed as only naming the individual Defendants in their individual capacity.

(*Id.* ¶ 3.) The Plaintiffs did not have any relationship involving the custody of or responsibility for any pupil at the school, or any related reason to be there. (*Id.* ¶ 4.) The Plaintiffs, with Daniel Demers driving, drove into the middle school property while school was in session, and drove around the entire school. (*Id.* ¶ 5.) During this time, Mrs. Demers was taking photographs of the school out of the passenger seat window. (*Id.*)

Plaintiffs' vehicle exited but then re-entered the middle school property. (*Id.* ¶ 6.) This time, the vehicle stopped in front of the school, Mrs. Demers got out, Mr. Demers parked, and Mrs. Demers walked to the entrance of the Red House wing of the middle school and attempted to open the doors, but they were locked.[3] (*Id.* ¶¶ 7-8.) Thereafter, she pressed her face to the glass doors and looked inside. (*Id.*) She also placed her camera to the glass and took photos of the interior of the building. (*Id.*)

At approximately 12:55 p.m., Pamela Estes, an employee of the middle school, was in the Red House hallway and observed Mrs. Demers' actions, including her camera pressed to the glass.[4] (*Id.* ¶ 9.) Ms. Estes approached the Demers at the door and inquired, "can I help you, what are you

---

[3] Plaintiffs object to Defendants' statements in Defendants' L.R. Stmt. ¶ 8 (and several later paragraphs) on the grounds that the actions by Plaintiffs described therein were unknown to Defendants at the time of the arrest and are therefore irrelevant to establishing probable cause for the arrest of loitering. While Plaintiffs' objection is noted, because Plaintiffs do not attempt to deny or refute this statement by directing the Court to opposing record evidence, as required by D. Conn. L.R. 56(a)(3) and Fed. R. Civ. P. 56(c)(1)(A), the Court treats these statements by Defendants as admitted.

[4] See note 3, *supra*. Plaintiffs object to but do not deny or rebut the facts in Defendants' L.R. Stmt. ¶ 9.

doing here?" with a look of terror on her face.[5] (*Id.* ¶ 10.) She appeared "very afraid" and "paranoid." (*Id.*)

The Demers informed Ms. Estes that Mr. Demers had attended the middle school and that he was showing his wife around. (*Id.* ¶ 11.) Estes told them that they could not be on school grounds milling around and that if they had business at the school they would have to check in with the main office.[6] (*Id.*) The Demers then left, getting back into their blue Cadillac sedan, which had an out-of-state license plate. (*Id.* ¶ 12.) As they drove away, they circled the entire school one more time.[7] (*Id.* ¶ 13.)

The sworn statement of Pamela Estes, ([Doc. # 32-3] at 72), states that she "felt very uneasy about their presence at the school as their behavior was odd[,]" and the principal "happened to be behind me as they drove off" and he "then said he'd report the incident." (*Id.*) Next, Defendants represent that "[a]s a result of the incidents and concerns it brought, the school was placed in lockdown[,] other Enfield schools were notified to keep a lookout for the blue [Cadillac], and the police were called." (Defs.' L.R. Stmt ¶ 15.)

At approximately 1:15 p.m., Officer Kevin Ragion of the Enfield Police Department was dispatched to JFK Middle School for a suspicious motor vehicle complaint. (Parties' L.R. Stmts ¶ 16.) Upon arrival, school staff told him that the occupants of a blue Cadillac with out-of-state plates

---

[5] See note 3, *supra.*

[6] Plaintiffs deny that they were, in fact, milling around but do not deny or identify evidence refuting Defendants' evidence that Ms. Estes *told* Plaintiffs that they could not mill around, which is a different statement. Accordingly, this paragraph is considered for the limited purpose of establishing what Ms. Estes told Plaintiffs.

[7] See note 3, *supra.*

from South Carolina or Georgia were taking pictures of the school, and that they were knocking on the windows of the Red Wing of the school. (*Id.* ¶ 17.) They informed Officer Ragion that the vehicle left prior to the police arriving and had last been seen traveling southbound on Raffia Road. (*Id.*)

School administrators, including Gary Harrison, the School Security Consultant for the Town of Enfield, were concerned over what they observed on video surveillance footage. (*Id.* ¶ 18.) They informed Officer Ragion that the camera that the Demers used had a zoom lens and that they were taking photos both of the outside of the school and of the inside, through the glass. (*Id.*)

Officer Ragion viewed the school surveillance video with school personnel. (*Id.* ¶ 19.) It appeared from the zoomed-in but pixelated video surveillance that the passenger was wearing a mask, and the passenger's hands were held in a manner that appeared to be holding binoculars.[8] (*Id.*) Additionally, the video showed that from the time the vehicle arrived to the time it left, the vehicle drove around the building twice. (*Id.*)

Video surveillance still images showed at 12:57:43 p.m. a blue Cadillac with the passenger's side window down and a white female with cupped hands around her face, in a position commonly used when holding binoculars.[9] (*Id.* ¶ 20.) Another image from 20 seconds earlier showed "what [unspecified] individuals (at the time) felt was the passenger wearing a mask." (*Id.*)

---

[8] Plaintiffs' denial of this statement is based on Ragion's deposition testimony that he knew prior to the arrest that Mrs. Demers was not surveilling the school with binoculars. This statement about what Ragion saw on the surveillance video does not speak to what Officer Ragion may have later learned.

[9] *See* note 8, *supra*. Plaintiffs argue that whatever the photos and video appeared to show is irrelevant and should not be considered. However, Plaintiffs acknowledge that Officer Ragion viewed the video prior to the arrest taking place, and these materials are properly a part of the summary judgment record.

At approximately 1:30 p.m., Officer Ragion, via radio, requested that his supervisor, Sergeant James Laurino, meet him at JFK Middle School so that he could brief him on the details of a suspicious vehicle that had been on the school grounds. (*Id.* ¶ 21.) When Sgt. Laurino arrived, he was briefed on the incident and the concerns of the school administrators. (*Id.* ¶ 22.) After hearing of the circumstances and viewing the still images from the surveillance video, he became more concerned about the safety of school occupants.[10] (*Id.*)

During this time, the Demers continued to travel throughout Enfield. (*Id.* ¶ 23.) Approximately one hour later, they drove onto the premises of Enfield High School and parked in front of the school, got out of the car, and began to take photographs of the school. (*Id.* ¶¶ 23-24).

School officials at the high school, who were alerted to be on the lookout for the Demers' vehicle, approached them and called the police. (*Id.* ¶ 25.) At approximately 2:10 p.m., the police received a report that a car fitting this description had been seen at Enfield High School. (*Id.* ¶ 26.) Sgt. Laurino was aware that there was no School Resource Officer on duty at the school at that time, so several officers were dispatched to the high school. (*Id.*) Sgt. Laurino then went to the high school while Officer Ragion stayed at the middle school for a short time before also traveling to the high school. (*Id.* ¶ 27.)

At the high school, the police questioned the Demers about their actions and the circumstances of their presence at JFK Middle School. (*Id.* ¶ 28.) Mr. Demers testified that when he drove up to the high school, he "could see a number of people descending upon us." (Ex. 1 (Demers Dep. [Doc. # 37-2]) to Pls.' Opp'n to Mot. Summ. J. at 64.) Demers "saw these people and

---

[10] Plaintiffs purport to rebut part of this statement by citing to evidence that *Ragion* (not Laurino) knew that Mrs. Demers was not using binoculars *prior to the arrest*. This evidence does not rebut the statement that Defendants made here, so Defendants' statement is deemed admitted.

they looked like they wanted to talk[,]" so he brought his vehicle to a stop and they approached him. (*Id.*)

A woman photographed the Demers' license plate, and he got out of the car to see why, when some men approached him. (Ex. A (Demers Dep. [Doc. # 32-3] to Mot. Summ. J. at 66.) Demers spoke with "a school administrator of some sort" and Demers told him "why we were there and basically the whole story." (*Id.* at 65.)

Demers "asked them why they were photographing [his] license plate" was told that "they were on the lookout for [his] car." (*Id.* at 67.) Demers asked why, and he was told "because . . . there was an incident at the junior high school . . . ." (*Id.*) Demers explained "[s]orry, I didn't realize there was an incident." (*Id.*) Demers explained why he was in town and what he was doing. (*Id.*) The administrator he was speaking with "nodded and seemed comfortable with what [Demers] was saying." (*Id.*)

Demers told the administrator that he was sorry and that he would be on his way, but when he got back into the car, the administrator asked Demers if he would mind waiting just a moment because the police wanted to file a report. (*Id.* at 67-68.) Demers said sure, shut off the car, and waited for the police to arrive. (*Id.* at 68.)

After the police officers arrived, one of the police officers asked Mr. Demers to approach him, which Demers did, and asked him for his story. (Demers Dep. [Doc. # 37-2] at 72.) Demers explained to the officer that he and Mrs. Demers were visiting the town after many years away, that he had been a student at these schools and stopped to show his wife around the town and to see what his old high school looked like. (*Id.*) The officer asked for Mr. Demers' identification, which he provided, and then asked him to stand in the center of the perimeter created by the Demers'

and the police cars on the scene until the patrol sergeant's arrival. (*Id.* at 72-73.) Mrs. Demers was instructed to stand by the front of the female officer's police cruiser. (*Id.* at 73.)

Demers "was looking forward to [Sergeant Laurino's] arrival because the officers around were very young, inexperienced, and they didn't seem to be making any decisions[,] so [he] was looking forward to a mature officer who [he] could tell [his] story to and tell him who [Demers] [was], what [his] reputation is and [his] credentials and even provide him with phone numbers of police departments that know [him] and" that would be able to confirm his identity. (*Id.* at 74.) Demers testified: "I was disappointed to find somebody with a very aggressive stance, kind of charging to us." (*Id.*) "He wasn't in any way trying to defuse the situation." (*Id.*) "The situation became much more tense upon his arrival because he had a very stern look in his face, what I would call an aggressive look and an aggressive posture and he got up pretty close to me and said, [']What's going on here?[']" (*Id.* at 74-75.)

Demers told Laurino that he had no idea and began to explain to him again what he had already told the other officer. (*Id.* at 75.) Demers testified that based on him having been told by the school administrator that the police wanted to file a report, he "was expecting a single patrol car to file a report, hear us out and that would be the end of it" and that he "was not expecting a SWAT team approach on myself and my wife." (*Id.* at 75-76.)

Demers testified that Laurino "seem[ed] totally uninterested in my story" and brusquely ordered him to move over to one of the cars, grabbing Demers by the bicep in an aggressive manner. (*Id.* at 76.) Demers testified that he gently asked why he needed to move, and Laurino responded by telling Demers "Shut up and get over to the car." (*Id.*) Demers complied. (*Id.*)

Laurino conducted a pat-down search and according to Demers also "grabbed me by the scrotum, firmly, very firmly, and not just a pat-down." (*Id.* at 77.) Demers testified that "[t]his was

just a long momentary pause where he grabbed and held on firmly[,]" and that Demers did not "know what the purpose of that is[,]" and had "never heard of that occurring." (*Id.*)

After what "seemed like an eternity[,]" Demers heard over the police radio that "it is all clear on Edith and Daniel Demers across the board." (*Id.* at 80.) After this, the police searched the Demers' car two times, then placed the Demers under arrest for loitering, and searched the car a third time. (*Id.* at 80-81.)

For her part, Mrs. Demers testified that a female police officer frisked her "very aggressively, especially [her] breasts[,]" which the officer frisked twice. (Ex. 2 (Edith Demers Dep. [Doc. # 37-3] to Pls.' Opp'n to Mot. Summ. J. at 42.)

Mr. and Mrs. Demers were arrested and charged with violating Con. Gen. Stat. § 53a-185, Loitering on School Grounds. (Parties' L.R. Stmts ¶ 30.) Officer Ragion handcuffed Mr. Demers and transported him to the police department, where he was processed in accordance with department protocol; Officer Magagnoli did the same with Mrs. Demers. (*Id.*) They were released from custody that evening. (*Id.* ¶ 32.)

The arrest reports for both of the Demers make clear that they were arrested at the high school for allegedly violating the loitering statute at the middle school, and Defendants do not contend that they had probable cause to arrest the Demers for loitering at the high school. (Arrest Reports [Doc. # 32-3] at 80, 84.)

The record contains audio dispatch recordings from March 23, 2016. (Ex. 9 to Defs' Mot. Summ. J.) In the first call to police, a caller who identifies herself as Sarah Brown from JFK Middle School reports that "we just had a couple come up to the door" of the Red Wing who were taking pictures and "banging on the door, trying to get in." (*Id.*) Ms. Brown reported that "we got their license plate, and they kind of drove off but we have a kid who has a protective order out and the

parent has South Carolina plates, so . . . ." (*Id.*) The assistant principal who was also on the call said he thought that the plates were either from Georgia or South Carolina but that he wasn't sure. (*Id.*)

## II.    Discussion

*Legal Standard*

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

1. *Probable Cause*

Defendants argue that summary judgment must be granted as to Plaintiffs' § 1983 claim for unreasonable seizure in violation of the Fourth Amendment and state law claim for false arrest, and that these claims fail as a matter of law because Defendants had probable cause to arrest Plaintiffs for violation of the school loitering statute.

Plaintiffs were arrested for violation of Conn. Gen. Stat. § 53a-185, Loitering on School Grounds, which provides that "a person is guilty of loitering on school grounds when he loiters or remains in or about a school building or grounds, not having any reason or relationship involving custody of or responsibility for a pupil or any other license or privilege to be there."

Plaintiffs effectively concede that they had *no relationship* involving the custody of or responsibility for a pupil, *no reason* to be at the school involving the custody of or responsibility for a pupil, and *no other* license or privilege to be there.[11] They contend, however, that they did have a reason to be there—just not one involving having a child at the school—and read the statute as establishing three exceptions to the anti-loitering rule: having *any* legitimate reason to be on school grounds, having a relationship involving the custody of or responsibility for a pupil, and having any other license or privilege to be there.

The statute is not crystal clear whether the phrase "any reason" is modified by "involving the custody of or responsibility for a pupil" or not, and the parties have identified no other state or federal authority construing the statute that would answer this question. The Connecticut Criminal Jury Instructions, 8.9-4, lend support to Plaintiffs' reading, because they define the exceptions as follows: "The second element is that the defendant had no reason, no relationship involving custody of or responsibility for a pupil, nor any other license or privilege to be there." In these instructions, unlike in the text of the statute, there is a comma between "no reason" and "no relationship" that suggests that the phrase that follows "no relationship" ("involving custody of or

_____

[11] At oral argument, Plaintiffs argued, for the first time, that they had a "sentimental privilege" to be on school grounds. In addition to failing to raise this argument in their Opposition to Defendants' Motion for Summary Judgment, Plaintiffs provided no authority suggesting that such a privilege existed or could have defeated probable cause under the circumstances of this case.

responsibility for a pupil") modifies only "no relationship" and not "no reason." However, the Court does not parse the text of pattern jury instructions as if they were themselves a statute in order to construe the statute at issue, particularly if the instruction is not squarely supported by the text of the statute itself. Here, the very part of the pattern jury instructions that supports Plaintiffs' reading—the comma after "no reason"—is conspicuously absent from the actual statutory text. Accordingly, the Court rejects Plaintiffs' attempt to show that Defendants lacked probable cause on this basis.

Plaintiffs also contend that Defendants lacked probable cause to arrest them because they were not actually *loitering*. The statute defines loitering broadly: "a person is guilty of loitering on school grounds when he loiters or remains in or about a school building or grounds[.]" The police report (Ex. D to Defs' Mot. Summ. J.) and attached witness statements, together with the 911 call made from the middle school, establish that the officers responding to the scene and making the arrest collectively knew that Plaintiffs had (1) come onto the grounds of JFK Middle School, (2) taken photographs, (3) knocked or banged on one of the doors and looked in/taken at least one photograph through the glass, and (4) that when a teacher responded to the door and told them that they needed to go check in at the main office, they said they were leaving instead, which they did.

Defendants contend that probable cause supporting the "loitering" element was met here because loitering can be accomplished by standing around or moving slowly about (citing to the Connecticut Criminal Jury Instructions 8.9-4), but they do not identify any record evidence that would definitively establish that Defendants had a basis for believing that Plaintiffs were in fact "standing around" or "moving slowly about" as opposed to what Plaintiffs testified they were doing, and what the record reflects Defendants *were* aware of their doing—Plaintiffs entered the

property without student-related reasons, took photographs, tried to enter the building, and then left.

Mr. Demers testified the time between when they entered the school property and when they left "seemed like two minutes"—"[i]t was a very short time." (Demers Dep. [37-2] at 44.) Of course, the mere fact that Demers testified they were only on the property for approximately that short time would be of no moment if the arresting police officers had a basis for believing that Plaintiffs had been on the property long enough to constitute loitering, or otherwise sufficient to establish that they had been "standing around" or "moving slowly about." Defendants acknowledge that as part of the decision to make the arrest here, Officer Ragion viewed the school surveillance video with school personnel. (Mem. Law. Supp. Defs.' Mot. Summ. J. [Doc. # 32-1] at 7.) Defendants direct the Court to no deposition testimony from Officer Ragion and no part of the surveillance video that would (1) rebut Demers' testimony that they were only on the property for a very short time or (2) establish that the video that Ragion viewed or the interviews that Ragion conducted led him to believe that the Demers had been on the property for a long enough time to constitute "loitering." Similarly, Defendants direct the Court to no record evidence indicating that Plaintiffs were "standing around," "moving slowly about," spending time idly, remaining in the same place on school property, or to any evidence that would establish that Defendants had reason to believe Plaintiffs were engaged in any such activity. While the parties agree that Ms. Estes, a teacher at JFK Middle School, told *Plaintiffs* that they could not be on school grounds milling around, there is no evidence in the record that Estes told *Officer Ragion* or any other officer that she believed that Plaintiffs were "milling around" before the Demers' arrests.

Accordingly, and drawing all reasonable inferences in favor of the non-moving party, the Court concludes that a reasonable jury could find that Defendants lacked probable cause to arrest

Plaintiffs for loitering, given (1) Mr. Demers' unrebutted testimony that they were only on the property for a very short amount of time, combined with the fact that (2) Officer Ragion watched video surveillance of this and did not claim, in the police report or at his deposition that the Demers had remained on the property for any extended period of time, (3) the absence of any record evidence suggesting that Plaintiffs were in fact standing around or moving slowly about the school grounds, and (4) the absence of any record evidence suggesting that Defendants had reason to believe that Plaintiffs were standing around or moving slowly about the school grounds.

  2. *Qualified Immunity*

In the alternative, Defendants argue that even if they lacked probable cause to arrest Plaintiffs, they are entitled to qualified immunity on the § 1983 unreasonable seizure claim, contending that their conduct does not violate any clearly established constitutional rights and that it was objectively reasonable for Defendants to believe their acts did not violate those rights. (Mem. Supp. Defs.' Mot. Summ. J. at 15.)

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (citing *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007) (other citations omitted)). Defendants bear the burden of establishing qualified immunity. *Id.* (citing *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013)).

"The right not to be arrested or prosecuted without probable cause has . . . long been a clearly established constitutional right." *Kafafian v. Young*, No. 3:10-CV-1657 JCH, 2011 WL 1134251, at *2 (D. Conn. Mar. 25, 2011) (citing *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). "When considering a question of qualified immunity, however, a district court must

determine whether, given the 'specific context of the case,' the right was clearly established." *Christman v. Kick*, 342 F. Supp. 2d 82, 89–90 (D. Conn. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "That is to say, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (other citations omitted). Officers "can still be on notice that their conduct violates established law even in novel factual circumstances[,]" and the "salient question" is "whether the state of the law" at the time of the challenged conduct gave officers "fair warning" that their alleged conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Defendants correctly cite *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004), for the proposition that "[e]ven if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." *Id.* "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' " *Id.* (citations omitted). But Defendants make no argument as to why, on the record of what the Defendants knew at the time of the arrest, they had even *arguable* probable cause to arrest Plaintiffs for violation of the loitering statute, given the apparently extremely short duration of Plaintiffs' visit to the school, the lack of any suggestion that Plaintiffs were standing idly around, and Plaintiffs' hasty departure from the school upon being told that they could not enter through the door that they were knocking on.

Defendants also cite *Saucier v. Katz*, 533 U.S. 194, 206 (2001), for the proposition that "[o]fficers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of

16

probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution." Defendants do not, however, explain what "reasonable, but mistaken" factual beliefs they claim entitle them to qualified immunity.

Moreover, a reasonable officer in 2013 would have understood that they lacked probable cause to arrest someone for loitering who was in fact moving around. *See City of Chicago v. Morales*, 527 U.S. 41, 61–62 (1999) (identifying "moving" as "activity that would not constitute loitering under any possible definition of the term"). Similarly, insofar as Plaintiffs attempted to enter the school and then left immediately after being told that they could not use their choice of entrance, a reasonable officer would understand that they lacked probable cause to arrest Plaintiffs, whether because this type of activity cannot be defined as loitering, or because Plaintiffs may have had a limited license to knock on the door, in the absence of any signs or fences explicitly or implicitly forbidding entry. *Cf. Fla. v. Jardines*, 569 U.S. 1, 8 (2013) (describing the "implicit license [that] typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.")

Because Defendants have failed to establish any theory on which they had arguable probable cause to arrest Plaintiffs or to identify any reasonable but mistaken facts upon which they relied that would establish probable cause, Defendants' Motion for Summary Judgment based on qualified immunity must be denied.

3. *Failure to Intervene*

Count Two of Plaintiffs' Amended Complaint claims failure to intervene to protect Plaintiffs' constitutional rights, brought under 42 U.S.C. § 1983. As to this claim, Defendants argue only that a claim for failure to intervene in the deprivation of constitutional rights is contingent upon a favorable disposition of the underlying claim—here, unreasonable seizure in violation of

the Fourth Amendment—and that because Defendants had probable cause to arrest Plaintiffs, this claim must fail. But for the reasons discussed above, a reasonable jury could conclude that Defendants lacked probable cause to make this arrest. Defendants advance no other arguments for granting summary judgment on this claim, so Defendants' Motion for Summary Judgment must be denied as to Count Two.

### 4. *Recklessness*

Count Four of Plaintiffs' Amended Complaint alleges "recklessness" by Defendants for failing or refusing to properly investigate the situation before effectuating the arrests. Defendants argue that because they had probable cause to arrest Plaintiffs, their conduct, as a matter of law cannot be deemed reckless. For the reasons discussed above, this argument is unavailing. Second, Defendants argue that the Connecticut common law claim of recklessness requires a risk of bodily harm, an argument that Plaintiffs fail to rebut.

"Recklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man, and the actor must recognize that his conduct involves a risk substantially greater . . . than that which is necessary to make his conduct negligent." *Matthiessen v. Vanech*, 266 Conn. 822, 832 (2003) (internal quotation marks and citations omitted). "One is guilty of reckless misconduct when knowing or having reason to know of facts which would lead a reasonable [person] to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him." *Craig v. Driscoll*, 64 Conn. App. 699, 721 (2001) (internal quotation marks and citations omitted).

18

The only types of bodily harm claimed by Plaintiffs involve the alleged intrusive searches about which both Plaintiffs testified, but which were not permitted to be claimed separately in the operative Amended Complaint. Plaintiffs seek to portray their Fourth Amendment claim as one for excessive force in addition to false arrest, but these allegations are absent from their original Complaint and their Amended Complaint, despite presumably being aware of the factual basis for these claims at the time suit was filed. (*See* Order Denying Motion for Leave to Amend Complaint (declining to permit amendment to include these allegations and claims because Plaintiffs failed to make this amendment until *after* discovery was closed and Defendants had moved for summary judgment, without good cause justifying the prejudice to Defendants and their undue delay).) Because the operative Amended Complaint contains no allegations of bodily harm, Defendants' Motion for Summary Judgment must be granted as to Count Four, for recklessness.

5. *Negligence Claims*

Plaintiffs bring Count Five for Negligence and Count Six for Negligent Infliction of Emotional Distress. Defendants argue first that because they had probable cause to arrest Plaintiffs, their conduct cannot, as a matter of law, be unreasonable. For the reasons discussed above, summary judgment will not be granted on this ground.

Second, Defendants argue that with respect to these two claims, they are entitled to governmental immunity pursuant to Conn. Gen. Stat. § 52-557n:

Connecticut municipalities "shall be liable for damages to person or property caused by . . . [t]he negligent acts or omissions of [the municipality] or any employee, officer or agent thereof acting within the scope of his employment or official duties" except where the damages were caused by "negligent acts or omissions which require the exercise of judgment or discretion as an

official function of the authority expressly or impliedly granted by law." Conn. Gen. Stat. § 52-557n(a)(1)(A); § 52-557n(a)(2)(B).

Plaintiffs appear to concede that the arrest here was, for the purpose of these counts, an act requiring the exercise of judgment or discretion. (*See* Pls.' Opp'n to Mot. Summ. J. at 19.) They contend, however, that their claims are not barred, because they fall into the imminent harm exception to the immunity.

"Discretionary act immunity is abrogated when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . ." *Doe v. Petersen*, 279 Conn. 607, 616 (2006) (internal quotation marks and citation omitted). "By its own terms, this test requires three things: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." *Id.*

Defendants direct the Court to authority suggesting that the imminent harm exception comes into play only in cases of physical harm or personal danger, (*see* Mem. Supp. Mot. Summ. J. at 26),[12] and Plaintiffs claim that they fit into this exception because of their claims for excessive force. Leave to amend to add excessive force claims was denied and Plaintiffs never pled their excessive force claims in their original or Amended Complaint. Thus, Plaintiffs have no extant claims for excessive force, notwithstanding their deposition testimony regarding groping.

---

[12] *See, e.g., Milardo v. City of Middletown*, No. 3:06CV01071(DJS), 2009 WL 801614, at *9 (D. Conn. Mar. 25, 2009) (finding that plaintiffs' claim does not fall within the imminent harm exception because it does not involve physical harm or personal danger (citing *Chipperini v. Crandall*, 253 F. Supp. 2d 301, 312 (D. Conn. 2003))).

Accordingly, they do not fit within this exception and Defendants are entitled to discretionary act immunity on Counts Five and Six.

### 6. *Indemnification Claims*

Finally, Plaintiffs claim in Count Eight that they are entitled to indemnification pursuant to Conn. Gen. Stat. § 7-465 and in Count Nine that they are entitled to indemnification pursuant to Conn. Gen. Stat. § 52-557n.

Plaintiffs argue that Count Nine's claim for indemnification pursuant to Conn. Gen. Stat. § 52-557n should survive to the extent that their claims for negligence and negligent infliction of emotional distress survive. Because the Court grants summary judgment on those claims, Defendants' Motion for Summary Judgment will be granted as to Count Nine as well.

Plaintiffs argue that Count Eight's claim for indemnification pursuant to Conn. Gen. Stat. 7-465 survives to the extent that Defendants may be held liable for the underlying § 1983 constitutional violations for unreasonable seizure (Count One) and failure to intervene (Count Two). Plaintiffs note that the only argument Defendants raise on Count Eight is that it fails because Plaintiffs cannot show that there is any underlying constitutional violation. Because the Court disagrees with Defendants' contention that a reasonable jury could not conclude that Plaintiffs' Fourth Amendment rights were violated, Defendants' Motion for Summary Judgment will be denied as to Count Eight.

### 7. *Monell Claim*

Finally, Defendants contend that summary judgment must be granted as to Plaintiffs' claim for municipal liability under § 1983 because the individual Defendants' actions do not amount to a constitutional violation, an argument that is unavailing. In light of the Court's denial of Defendants' Motion for Summary Judgment on Plaintiffs' constitutional claim, and since the

Court granted Defendants' Motion to Bifurcate and Stay Discovery as to Plaintiffs' Monell claim, consideration of summary judgment on any other grounds would be premature.

### III.    Conclusion

For the reasons set forth above, the Court grants Defendants' Motion for Summary Judgment as to Count Four (Recklessness), Count Five (Negligence), Count Six (Negligent Infliction of Emotional Distress), and Count Nine (Statutory Indemnification pursuant to Conn. Gen. Stat. § 52-557n), denies Defendants' Motion for Summary Judgment as to Count One (Unreasonable Seizure in Violation of the Fourth Amendment, brought under 42 U.S.C. § 1983), Count Two (Failure to Intervene, brought under 42 U.S.C. § 1983), Count Three (False Arrest), and Count Eight (Statutory Indemnification Pursuant to Conn. Gen. Stat. § 7-465), and denies without prejudice Defendants' Motion for Summary Judgment as to Count Seven (Municipal Liability).

The parties are directed to file a joint status report within seven days providing a proposed scheduling order for remaining *Monell* discovery and summary judgment briefing on the *Monell* claim.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 10th day of August 2018.